# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**TYRONE WHITMORE,**

    **Plaintiff,**

    **v.**                                       **Case No. 13-CV-260**

**BOELTER BRANDS,**

    **Defendant.**

---

## DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

Tyrone Whitmore ("Whitmore") brings this lawsuit against his former employer, Boelter Brands ("Boelter"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Equal Pay Act ("EPA").[1] Boelter has moved for summary judgment on all of Whitmore's claims. For reasons I will explain here, Boelter's motion for summary judgment will be granted and the case will be dismissed.

### SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248.

---

[1] Whitmore's Civil Cover Sheet (Docket # 1-1) includes Title VII and the EPA, as well as the Equal Gender Act, which does not exist, and claims for "retaliation" and "unfair dismissal." Based on the allegations in the complaint, it appears that all of Whitmore's claim fall under Title VII and/or the EPA.

The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc.,Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## FACTS

### 1.     Governing Law

Pursuant to the Local Rules and relevant case law, I must accept as true all of the Defendant's Proposed Findings of Fact because Whitmore has failed to file a response or his own proposed findings of fact. Civil L.R. 56(a) (E.D. Wis.) governs the procedures a party opposing a *pro se* litigant must follow when filing for summary judgment. The Rule requires the moving party to provide the *pro se* litigant with the text to Fed. R. Civ. P. 56(c), (d), and

(e); Civil L.R. 56(a) and 56(b); Civil L.R. 7; and an express warning regarding findings of fact, as required by Civil L.R. 56(a)(1):

> The motion must include a short and plain statement that any factual asser-tion in the movant's affidavit, declaration, or other admissible documentary evidence will be accepted by the Court as being true unless the party repre-sented by counsel submits the party's own affidavit, declaration, or other ad-missible documentary evidence contradicting the factual assertion.

The defendant's motion contained the required components, including the warning, which explained to Whitmore that he must contradict those proposed facts with which he disa-grees using documentary evidence. (*See* Docket # 28-1.) Whitmore filed a response to the defendant's motion, consisting of two pages, in which he asserted that he "clearly estab-lished valid merits to the aforementioned claims" and the defendant "blatantly violates, not only their own established policy and procedures but State and Federal regulations as well." (Docket # 36 at 1.) He did not include any affidavits, declarations, or other documentary evidence contradicting the defendant's factual assertions. Additionally, he submitted a reply that conceded that he does not contest the defendant's assertions, primarily because he found most to be in support of his claims. (*See* Docket # 41.)

Civil L.R. 56(a)(1) makes clear that a court accepts as true those proposed facts to which a non-moving party does not object through appropriate means. Whitmore was in-formed of the consequences. Though a court has discretion in enforcing and adhering to the local rules, Whitmore has offered nothing at all in response to the defendant's proposed facts. *See Coleman v. Goodwill Industries of Southereastern Wisconsin, Inc.*, 423 Fed. Appx. 642 (7th Cir. 2011) (affirming a district court's decision to reject a *pro se* litigant's responses to the defendant's proposed findings of fact because it was not a paragraph-by-paragraph re-sponse as required by the Local Rules). I appreciate the complexity of summary judgment

3

motions for *pro se* litigants, but Whitmore has provided the court with nothing that suggests there is evidence upon which a jury could find in his favor nor has he attempted to contradict the facts proposed by the defendant.[2] *See Garza v. Wautoma Area Sch. Dist.*, No. 12-C-1056, 2013 WL 6045688, *8 (E.D. Wis. Nov. 14, 2013). Therefore, I will accept as true the Defendant's Proposed Findings of Fact ("DPFOF"). (Docket # 30.)

### 2.    Uncontested Facts

The facts proposed by the defendant, and accepted by the Court, are as follows.

*Background Regarding Boelter Brands*

Boelter Brands is a marketer and distributer of officially licensed drink ware, barware, kitchenware, and tailgating items. (DPFOF, Docket # 30 at ¶ 5.) Particularly, Boelter markets and distributes items licensed by the NFL, MLB, NHL, NBA, Live Nation, a number of major breweries, and over 150 colleges. (*Id.*) Boelter operates a warehouse in Glendale, Wisconsin (the "Glendale facility"). (*Id.* at ¶ 1.) The president of Boelter is Jay Wilcox, a male, and he has been president since July 28, 2003. (*Id.* at ¶ 2.) Josh Peterson, who is a male, is currently the Director of Operations and has been since June of 2011. (*Id.* at ¶ 3.) The Operations Manager, Todd Hentz, is also male and has been the Operation Manager since January 3, 2011. (*Id.* at ¶ 4.)

Boelter's business is busiest in the third and fourth quarters of the calendar year, when the NHL, football, and basketball seasons begin, combined with the MLB playoffs. (*Id.* at ¶ 6.) Its business is least busy during the first and second quarters of the year. (*Id.*) Because of the fluctuation in its business, Boelter utilizes different employment classifications. (*Id.* at ¶ 7.) The entry level employment classification is "Temporary Employee," and those

---

[2] To the extent that Whitmore suggests that he needed more time to get evidence from his witnesses (*see* Docket # 41), Whitmore made no such request for an extension from the court.

4

employees are usually provided by a temporary service agency. (*Id.* at ¶ 8.) These employees are paid by the temporary service agency, are paid at a lower rate, receive no benefits, and are the first to be terminated if a reduction in staff is required. (*Id.*) Goodwill TalentBridge is one such agency, and TalentBridge establishes the pay and benefits received by employees it places at Boelter. (*Id.* at ¶ 11.) The pay is generally lower than the pay and benefits provided by other temporary service agencies. (*Id.*) Furthermore, those employees placed at Boelter by TalentBridge are historically less skilled, less reliable, and less likely to succeed. (*Id.* at ¶ 12.) The majority of employees at Boelter who have been placed by TalentBridge do not become employees of Boelter. (*Id.* at ¶ 13.)

The next employee classification is the "Casual Employee." (*Id.* at ¶ 14.) These employees are employed directly by Boelter on an at-will basis, and they receive a slightly higher pay rate than Temporary Employees, but they receive no benefits. (*Id.*) When staffing reductions are required, they are the first to be terminated after Temporary Employees. (*Id.*) The third level of employment classification is the "Regular Employee." (*Id.* at ¶ 15.) Regular Employees are employed on an at-will basis, are paid slightly more than Casual Employees, receive benefits, and are terminated if more reductions are needed after Temporary and Casual Employees are terminated. (*Id.*)

These employment classifications are not synonymous with tenure or seniority. (*Id.*) Boelter does not have unionized employees, and it does not observe or recognize seniority of its employees, and does not factor that variable into its promotion or termination decision-making processes. (*Id.* at ¶ 17.)

Between 2009 and May of 2012, Boelter instituted a wage freeze due to negative economic conditions. (*Id.* at ¶ 18.) Everyone at Boelter was subject to the wage freeze. (*Id.* at

¶ 19.) No employees received raises during the wage freeze, unless they were a Temporary Employee hired as a Casual Employee, a Casual Employee hired as a Regular Employee, or if they were formally promoted to a higher paying position. (*Id.* at ¶ 20.)

*Changes to the Staffing, Structure, and Procedures of the Repack Area*

There are four primary areas for processing orders at the Glendale facility: the purchasing/customer service area; the warehouse area; the repack area; and the shipping area. (*Id.* at ¶ 21.) In the repack area at the Glendale facility, employees physically assemble customers' orders so that they can be shipped. (*Id.* at ¶ 22.) Before the implementation of a new system, the repack area at the Glendale facility was staffed by two different positions: Line Workers and Line Leaders. (*Id.* at ¶ 35.) Both positions were responsible for the actual assembly of orders. (*Id.*) Line Leaders were considered the point person for their assembly table and answered questions from Line Workers and ensured their orders were properly assembled. (*Id.*) Before the ATO system was implemented, Line Leaders did not need special education or training. (*Id.* at ¶ 37.)

In October of 2010, Boelter formed an Operation Planning Committee in order to improve order processing as the Glendale facility. (*Id.* at ¶ 23.) Based on the Committee's recommendations, Boelter implemented an Assembly-to-Order ("ATO") System in the repack area. (*Id.* at ¶ 24.) Boelter began using the ATO system on August 19, 2011, which was referred to as the "go-live" date. (*Id.* at ¶ 25.) When the ATO system was implemented, the switch was hectic and chaotic; the ATO system was complicated. (*Id.* at ¶ 26.) The implementation of the ATO system was not smooth and did not have the desired effect of reducing the existing backlog of orders. (*Id.* at ¶ 41.) The system required more skill than the old system (*id.* at ¶ 42), and most of the existing employees were not prepared or equipped to

6

handle the new system (*id.* at ¶ 43). Because of the ATO system, the Glendale facility experienced changes to staffing, procedure, and infrastructure. (*Id.* at ¶ 27.)

Boelter established standard operating procedures, including time standards and expectations for order assembly (*id.* at ¶ 38), which it did not have in place prior to implementing the ATO system (*see id.* at ¶¶ 29-31). Boelter also installed five conveyor belts to replace the assembly tables and five computers to replace the paper lists formerly used during order assembly. (*Id.* at ¶ 39.) A new position, called "Line Assistant," was created to be the last worker on each line to check the orders. (*Id.* at ¶ 40.)

In addition, Director of Operations, Josh Peterson ("Peterson"), began making staffing changes in the repack area in order to maximize the effectiveness of the ATO system. (*Id.* at ¶ 44.) The first change Peterson made was to add a new layer of supervision and oversight between himself and the five lines in the repack area, called a Team Lead/Floor Lead. (*Id.* at ¶ 45.) This new position was intended to address the recognized skill void, to problem solve, to give direction to the employees working the conveyor belts, to lead the workers, and to keep daily production on track. (*Id.* at ¶ 46.)

Initially, Peterson believed that two Team Leads/Floor Leads would be sufficient to solve the problems associated with the implementation of the ATO system. (*Id.* at ¶ 47.) Peterson promoted two existing employees, based on their on-the-job leadership skills, their compliance with process and expectations, and their computer skills. (*Id.* at ¶ 48.) He did not post the new position, nor did he solicit applications or consider other individuals for the position. (*Id.* at ¶ 49.) Barbara Roohr ("Roohr") and Shaquita Cox ("Cox") accepted the promotion and received pay raises. (*Id.* at ¶ 50.) Roohr and Cox were not promoted by the

7

Scheduling/Assembly Manager, Sheena Allen ("Allen"), nor were they promoted to be her assistants, though they reduced her workload. (*Id.* at ¶ 51.)

Despite adding an additional position—Warehouse Operations Manager (*id.* at ¶ 54)— and some improvement in the repack area, the repack area was still not at functioning level in October 2011 (*id.* at ¶ 57). Peterson determined that two Team Lead/Floor Lead positions was not enough to manage all five conveyor belts at the same time. (*Id.* at ¶ 58.) He decided to assign Line Leaders to each of the conveyor belts, beginning with Roohr and Cox. (*Id.* at ¶ 59.) Being made Line Leader was neither a promotion or demotion for Roohr and Cox; their pay and benefits were not affected. (*Id.* at ¶ 60.) The change in their positions was not due to their performance but rather because the duties and responsibilities were too much for two individuals to manage. (*Id.*)

The Line Leader position, though the same in name as a position used before the implementation of the ATO system, was significantly different in terms of expectations and responsibility. (*Id.* at ¶ 61.) Before, a Line Leader was a less formal position, and it required less skill and enjoyed less responsibility. (*Id.* at ¶ 62.) Line Leaders performed hands-on order assembly. (*Id.*) Indeed, before the implementation of the ATO system, there was little observable difference between a Line Leader and a Line Worker. (*Id.*) However, after the implementation of the ATO system, Line Leader was a formally recognized position, which required leadership and computer skills and enjoyed supervisory responsibilities; Line Leaders performed virtually no actual order assembly. (*Id.* at ¶ 63.) Now, there is an observable difference between a Line Leader and a Line Worker. (*Id.*)

Though there were two formal Line Leaders, Roohr and Cox, Boelter often still needed to run all five conveyor belts in order to catch up with the backlog of orders. (*Id.* at ¶

8

64.) When more than two conveyor belts were running, Peterson decided to temporarily as-
sign existing employees, both men and women, to serve as Line Leaders. (*Id.* at ¶ 65.) Peter-
son's combined goal was to (1) catch up on the backlog of orders and (2) to find qualified
individuals for filling the position of Line Leader on a permanent basis. (*Id.* at ¶ 66.) Those
employees who were temporarily assigned to serve as Line Leader were not paid more dur-
ing the temporary assignment. (*Id.* at ¶ 67.) During the temporary Line Leader assignments,
two employees stood out as being qualified to fill the position: Aquarius Bradford (female)
and Jorge Discua (male). (*Id.* at ¶ 68.) They accepted the positions and accompanying pay
increase when offered the promotion. (*Id.* at ¶ 69.)

*Whitmore's Employment at Boelter Brands*

The plaintiff was first placed at Boelter in May 2011 as a temporary employee by
Goodwill TalentBridge. (*Id.* at ¶ 70.) Whitmore's level of compensation and benefits were
determined by TalentBridge while he was a temporary employee (*id.* at ¶ 73), and Talent-
Bridge paid him $7.50 an hour (*id.* at ¶ 71). As a temporary employee, Whitmore worked as
Line Worker in the repack area of the Glendale facility. (*Id.* at ¶ 72.) Whitmore was then
hired by President Wilcox and Operations Manager Hentz to work directly for Boelter as a
casual employee in June 2011. (*Id.* at ¶ 74.) At that time, Boelter was in the midst of its busy
system, implementing the new ATO system, and the wage freeze. (*Id.*)

When Whitmore was hired as a casual employee, he received a $0.50 per hour raise,
up to $8.00 an hour, and he continued working in the repack area of the Glendale facility.
(*Id.* at ¶ 76.) His pay rate was determined by President Wilcox and Operations Manager
Hentz (*id.* at ¶ 77), and it was based on his prior wage though TalentBridge, the timing of
his hire (before the ATO system was implemented), his status as a casual employee, his en-

9

try level assignment as a Line Worker, and his lower-paying work area in the repack area (*id.* at ¶ 78). He was employed on an at-will basis, and his schedule could be non-routine and irregular. (*Id.* at ¶ 75.)

When Whitmore was hired by Boelter as a casual employee, he believed there was a total of four Line Leaders: Toya, Barb, Jesus, and Delmy. (*Id.* at ¶ 79 (citing Whitmore Dep., Docket #31-1 at 49:21-25).) He considered one of his co-workers, Toya, his Line Leader. (*Id.* at ¶ 80 (citing Whitmore Dep., Docket # 31-at 49:4-17).) After Toya left but before the ATO system was implemented, Whitmore considered Roohr his Line Leader. (*Id.* at ¶ 81 (citing Whitmore Dep., Docket # 31-1 at 85:6-86:10).) Whitmore believes that he was told he was a Line Leader before implementation of the ATO system. (*Id.* at ¶ 82 (citing Whitmore Dep., Docket # 31-1 at 78:12-17, 79:11-80:7).) Whitmore believes Todd Hentz, who was terminated before implementation of the ATO system, was the one who wanted him to be a Line Leader. (*Id.* at ¶ 84 (citing Whitmore Dep., Docket # 31-1 at 79:17-80:5).)

When an employee at Boelter is promoted (for example, from Line Worker to Line Leader), the employee signs a status change form. (*Id.* at ¶ 84.) Whitmore stated that the only form he signed while working at Boelter was his employee status acknowledgment and that he signed no other forms. (*Id.* at ¶ 85 (citing Whitmore Dep., Docket # 31-1 at 30:1-8).) He believes that employees at Boelter, both men and women, got paid more for various reasons: because they were "networked" or knew people at the company and because they were hired after the ATO system was implemented. (*Id.* at ¶ 86 (citing Whitmore Dep., Docket # 31-1 at 40:20-41:23, 87:17-88:4).) He believes that other employees on his line, both men and women, got paid more than him. (*Id.* at ¶ 88 (citing Whitmore Dep., Docket # 31-1 at 38:8-12).)

10

Whitmore was not considered for the Team Lead/Floor Lead position to which Roohr and Cox were promoted. (*Id.* at ¶ 87 (citing Whitmore Dep., Docket # 31-1 at 118:14-119:4, 122:9-123:3).) When the new Line Leader position was created in September 2011, Whitmore did not audition. (*Id.* at ¶ 89.) Whitmore would not have been paid more for working as a temporary Line Leader in September 2011 (*id.* at ¶ 90), and he was not chosen to be a permanent Line Leader in September 2011 (*id.* at ¶ 91).

Whitmore never complained to Peterson, the Director of Operations, about his rate of pay while he worked at Boelter. (*Id.* at ¶ 92.) He also did not bring any grievances to the attention of the Human Resources department during the course of his employment. (*Id.* at ¶ 93 (citing Whitmore Dep., Docket # 31-1 at 99:24-100:1, 110:3-6).) Whitmore stated that he never complained to anyone about his rate of pay while he worked at Boelter. (*Id.* at ¶ 94 (citing Whitmore Dep., Docket # 31-1 at 100:2-6).) He did ask to be a Line Worker instead of a Line Leader (*id.* at ¶ 95 (citing Whitmore Dep., Docket # 31-1 at 81:14-23, 100:15-20)), but he did not say that he wanted to be Line Worker because of his pay (*id.* at p 96 (citing Whitmore Dep., Docket # 31-1 at 81:24-82:6)).

During his employment, Whitmore mentioned the "Equal Rights Division," the "ERD," or the "EEOC" to the Warehouse Operations Manager, Brett Robley. (*Id.* at p 97 (citing Whitmore Dep., Docket # 31-1 at 94:17-95:5, 100:15-20).) He believes that Robley started treating him differently after he mentioned the ERD or EEOC; Whitmore believes Robley tried to pester him, to push him to leave or to quit, and tried to make his workload heavier. (*Id.* at ¶ 98 (citing Whitmore Dep., Docket # 31-1 at 100:15-101:3).) Whitmore also believes that Jorge Discua was also being pushed by Robley. (*Id.* at ¶ 100 (citing Whitmore

11

Dep., Docket # 31-1 at 102:21-103:5).) Robley never told Whitmore that he was being treated differently. (*Id.* at ¶ 99 (citing Whitmore Dep., Docket # 31-1 at 101:4-5).)

*Staffing Levels and Compensation Rates During Whitmore's Employment*

During Whitmore's tenure at Boelter, there were a total of 52 casual employees (*id.* at ¶ 101), 40 of which were males, who worked in repack, pack/ship, and the warehouse (*id.* at ¶ 102), and 12 of which were females, who worked exclusively in the repack area (*id.* at ¶ 103). These 52 employees were paid between $8.00 and $11.00 per hour, depending on their position, skill level, experience, and performance. (*Id.* at ¶ 104.) The casual employees who made $8.00 an hour primarily started with Boelter as temporary employees from Talent-Bridge. (*Id.* at ¶ 105.) Generally, positions in the pack/ship and warehouse areas require more skill and were therefore compensated at a higher rate. (*Id.* at ¶ 106.) The repack positions required less skill and were therefore compensated at a lower rate. (*Id.*) Following the implementation of the ATO system, however, positions within the repack area require more skill and are therefore more highly compensated. (*Id.* at ¶ 107.)

Eight of the casual employees working at the Glendale facility during Whitmore's tenure as a casual employee were paid $8.00 an hour: five males (including the plaintiff) and three females. (*Id.* at ¶ 108.) The remaining 44 casual employees working at Boelter during Whitmore's tenure as a casual employee were paid more than $8.00 an hour: 35 males and nine females. (*Id.* at ¶ 109.) Of the 52 casual employees at Boelter's Glendale facility during Whitmore's time as a casual employee, 26 worked in the repack area, including Whitmore. (*Id.* at ¶ 110.) Six of these employees made $8.00 an hour, three of whom were male (including Whitmore) and three of whom were female. (*Id.* at ¶ 111.) Four of these six were initially placed at Boelter by TalentBridge as temporary employees. (*Id.* at ¶ 112.)

12

Twenty of the 26 employees in the Glendale facility's repack area were paid more than $8.00 an hour, eleven of whom were males and nine of whom were female. (*Id.* at ¶ 113.) Ten of these twenty made $9.00 per hour: eight males and two females. (*Id.* at ¶ 114.) The highest rate of pay among the casual employees in the repack area was $10.00 an hour, which was earned by two employees, one male and one female. (*Id.* at ¶ 115.)

*Boelter's Reduction in Force and Whitmore's Termination*

By the fall of 2011, Boelter had eliminated its backlog of orders due to the combination of the implementation of the ATO system, staffing modifications, and the seasonal slowdown in business. (*Id.* at ¶ 116.) Once the backlog of orders was cleared, Boelter had more employees than the number of orders demanded. (*Id.* at ¶ 117.) Peterson determined that a number of employees needed to be terminated in order to match staffing levels with the volume of orders. (*Id.* at ¶ 118.) The first step was to cancel any temporary employees, who do not actually work for Boelter. (*Id.* at ¶ 119.) Cancelling these employees was insufficient to balance staffing levels with order volume, and the next step was to terminate casual employees, who are entry-level employees of Boelter. (*Id.* at ¶ 120.) Boelter terminated a total of 15 casual employees from the Glendale facility between August 2011 and December 2011 due to the implementation of the ATO system and the seasonal downturn in business. (*Id.* at ¶ 121.) Eight of these employees were in the repack area, and five were male and three were female. (*Id.* at ¶ 122.) Four of the 15 casual employees who were terminated made $8.00 per hour and were terminated on December 2, 2011, two of whom were male (including the plaintiff) and two of whom were female. (*Id.* at ¶ 123.) These termination decisions were approved by Peterson. (*Id.* at ¶ 124.)

13

Whitmore's employment with Boelter was terminated on December 2, 2011. (*Id.* at ¶ 125.) He was terminated because Boelter was overstaffed, he had an entry-level position as a Line Worker, and he did not distinguish himself under the new ATO system. (*Id.* at ¶ 126.) Whitmore was informed of his termination by Warehouse Operations Manager Robley, with Scheduling/Assembly Manager Allen as a witness. (*Id.* at ¶ 127 (citing Whitmore Dep., Docket # 31-1 at 105:20-106:2).) He was not told that he was being terminated because he complained about his pay. (*Id.* at ¶ 128 (citing Whitmore Dep., Docket # 31-1 at 107:17-21).) Whitmore was told that the decision to terminate his employment had been made by upper management. (*Id.* at ¶ 129 (citing Whitmore Dep., Docket # 31-1 at 74:1-11, 106:3-5).) He was not terminated because he had poor performance, because he was male, because he complained about his pay, or because Peterson believed he would complain about his pay. (*Id.* at ¶ 130.)

*Whitmore's Allegations*

Whitmore stated that he is not alleging that he was paid less because he is a man. (*Id.* at ¶ 131 (citing Whitmore Dep., Docket # 31-1 at 116:25-117:10).) Rather, Whitmore is alleging that he should have gotten fair pay for being a Line Leader. (*Id.* at ¶ 132 (citing Whitmore Dep., Docket # 31-1 at 117:8-9).) He is also alleging that he should have been considered for the position that was given to Roohr and Cox. (*Id.* at ¶ 133 (citing Whitmore Dep., Docket # 31-1 at 117:14-118:6).) Whitmore is not alleging that he should have been offered the position given to Roohr and Cox, just that he and his co-workers should have been evaluated for the position. (*Id.* at ¶ 134 (citing Whitmore Dep., Docket # 31-1 at 118:14-22).)

14

When Whitmore was hired by Boelter, he believed that a number of employees would eventually need to be fired given the number of employees. (*Id.* at ¶ 135 (citing Whitmore Dep., Docket # 31-1 at 112:8-24).) He was not told that he was terminated because of his performance (*id.* at ¶ 136 (citing Whitmore Dep., Docket # 31-1 at 106:14-18, 107:14-16, 120:3-7)) nor was he told he was terminated because he complained about his job (*id.* at ¶ 137 (citing Whitmore Dep., Docket # 31-1 at 107:17-21)). Whitmore was told that he was terminated due to a decision from upper management. (*Id.* at ¶ 138 (citing Whitmore Dep., Docket # 31-1 at 74:3-11, 106:3-5).) He believes his termination was wrongful because he did not have any performance issues. (*Id.* at ¶ 139 (citing Whitmore Dep., Docket # 31-1 at 120:3-7).) He also believes it was inappropriate that Roohr replaced him after he was terminated. (*Id.* at ¶ 140 (citing Whitmore Dep., Docket # 31-1 at 123:16-124:10).) Whitmore also said that he was "cool" with Roohr taking over his line and did not argue because she had more seniority. (*Id.* at ¶ 144 (citing Whitmore Dep., Docket # 31-1 at 85:5-86:4).)

During Whtimore's employment at Boelter, no casual employee ever complained to Human Resources about their rate of pay. (*Id.* at ¶ 141.) Delmy Gomez, one of the people Whitmore identified as his Line Leader, was not part of the reduction-in-force between August 2011 and December 2011 because she demonstrated on-the-job leadership skills, process and expectation compliance, and computer skills following implementation of the ATO system. (*Id.* at ¶ 142.) Roohr was not part of the reduction-in-force because she was a regular employee of Boelter, was in a supervisory position (Line Leader), and had demonstrated on-the-job leadership skills, process and expectation compliance, and computer skills following implementation of the ATO system. (*Id.* at ¶ 143.)

15

**ANALYSIS**

Construing Whitmore's complaint broadly, he makes five different claims—four under Title VII of the Civil Rights Act of 1964 ("Title VII") and one under the Equal Pay Act ("EPA"). Particularly, by examining the complaint and the civil cover sheet Whitmore filled out accompanying his complaint, Whitmore appears to allege pay discrimination, failure to promote, termination, and retaliation claims under Title VII and a pay discrimination claim under the EPA. Summary judgment is appropriate on each of these claims.

1.     **Title VII**

Whitmore alleges that Boelter discriminated against him on the basis of his sex, in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e–2(a)(1). Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Id.* Thus, there are two primary issues to consider: first, was the purported difference in treatment prompted by Whitmore's sex, and second, did the difference in treatment affect Whitmore's compensation, terms, conditions, or privileges of employment. *Haugerud v. Amery School Dist.*, 259 F.3d 678, 691 (7th Cir. 2001). If there is enough evidence for a reasonable jury to conclude that the plaintiff's sex prompted the disparate treatment (and that the treatment affected the plaintiff's employment in a tangible way), then the case is suited for trial, not summary judgment. *Id.*

A plaintiff can establish discrimination in violation of Title VII using either the direct or indirect method of proof. *Johnson v. General Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727 (7th Cir. 2013).The direct method requires that the plaintiff provide direct or circumstantial evidence of the employer's discriminatory animus. *Id.* The

16

indirect method, by contrast, requires the plaintiff to follow the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Id.* at 728. Under the *McDonnell Douglas* framework, after the plaintiff makes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its action. *Id.* Doing so shifts the burden back to the plaintiff to show that the employer's proffered reason is pretext, which then permits an inference that the employer's real reason was unlawful. *Id.*

Under the direct method, the plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it "uniquely reveals" the employer's intent to discriminate. *Id.* More common is circumstantial evidence, which "suggests discrimination albeit through a longer chain of inferences." *Id.* (internal citation omitted). A plaintiff can survive summary judgment by producing either type of evidence as long as it creates a triable issue on whether discrimination motivated the employment action. *Id.* Our cases point to three categories of circumstantial evidence: (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Id.* A plaintiff need not produce evidence in each category to survive summary judgment. *Id.*

17

Under the indirect method of proof, a plaintiff can "avert summary judgment" by establishing a *prima facie* case of discrimination under the *McDonnell Douglas* formula. *Lewis v. City of Chicago*, 496 F.3d 645, 650 (7th Cir. 2007). To establish a *prima facie* case of sex discrimination under Title VII, Whitmore must show that (1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer treated a similarly situated woman more favorably. *See Cullen v. Indiana University Bd. of Trustees*, 338 F.3d 693, 704 (7th Cir. 2003). If Whitmore establishes a *prima facie* case, the burden shifts to Boelter to provide legitimate reasons for the disparity. *See id.* If Boelter provides legitimate reasons, then Whitmore must establish that the proffered reasons are pretextual. *See id.* Additionally, because Whitmore is a male alleging gender discrimination, he is alleging "reverse discrimination." *See Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003). A plaintiff must show "'background circumstances' that demonstrate that a particular employer has 'reason or inclination to discriminate against [males]' or evidence that 'there is something "fishy" about the facts at hand.'" *Id.* (quoting *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 457 (7th Cir. 1999) (internal citation omitted)); *see also Farr v. St. Francis Hosp. and Health Centers*, 570 F.3d 829, 833 (7th Cir. 2009) ("In addition, when a plaintiff is a member of a 'majority' – for instance, a male plaintiff alleging gender discrimination – we have said that he must set out 'background circumstances' that show that the employer discriminates against the majority, or he must show there is something 'fishy' going on." (internal citation omitted)).

### 1.1    Pay Discrimination

In his complaint, Whitmore seems to allege that he was dissatisfied by his rate of pay. From the context of his complaint, however, his complaint appears to be more about

not being adequately compensated for the nature of the work he was doing, rather than a complaint about being paid less because he is male. Indeed, Whitmore's deposition confirms this. When asked to clarify whether his lawsuit alleges that he was paid less because he is a man, Whitmore stated: "No, I was just going for fair pay from being a line leader." (Whitmore Dep., Docket # 31-1 at 116:25-117:7.) He stated again: "Equal pay for line leader, that's it." (*Id.* at 117:9.) Later in the deposition, when asked to confirm the allegations of his suit, Whitmore confirmed his pay claim has to do with being "compensated for the job that [he] was doing." (*Id.* at 121:23.)

By Whitmore's own deposition testimony, it is evident his pay discrimination claim is not about being male. Rather, Whitmore feels that it was unfair that he was asked to serve as a temporary Line Leader but not compensated more than when he worked as a Line Worker. For this reason, he asked to work as a Line Worker again, though he did not tell anyone that his rate of pay motivated him to ask for the change in position. (*See id.* at 81:14-82:26, 100:15-20.) Though Whitmore understandably may have felt his rate of pay was unfair based on the work he was asked to do, this is not a claim of pay discrimination. Whitmore's own testimony makes this clear, and I need not determine whether he has stated a *prima facie* case of pay discrimination under Title VII.

### 1.2    Failure to Promote

In order to state a *prima facie* failure to promote claim under Title VII, Whitmore "must show that (1) [he] is a member of a protected class; (2) [he] applied for, and was qualified for an open position; (3) [he] was rejected; and (4) the employer filled the position with a person not in [his] protected class, or the position remained open." *Howard v. Lear Corp. EEDS and Interiors*, 234 F.3d 1002, 1006 (7th Cir. 2000) (citing *Mills v. Health care Serv. Corp.*,

19

171 F.3d 450, 454 (7th Cir. 1999)). In this case, however, the position to which two females were promoted was never advertised; Boelter did not seek or accept applications for the newly-created position. (*See* DPFOF, Docket # 30 at ¶¶ 48-50.) When an employer "does not solicit and await applications but hands out promotions," a plaintiff can establish a *prima facie* case by alleging that "the employer's decision not to approach people of [his] status was itself illegitimately motivated" and showing "that but for such a practice [he] likely would have been approached." *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 523 (7th Cir. 1994). In these cases, a plaintiff must also demonstrate that he would have accepted the position if offered in order to complete "the chain of causation." *Id.* As noted above, Whitmore can provide direct or indirect proof to establish his *prima facie* case.

Whitmore has not offered any direct evidence, circumstantial or otherwise, that he was not promoted (or considered for a promotion) because he is male. It is not enough that two women were selected to fill the newly-created position following the implementation of the ATO system. (*See* DPFOF, Docket # 30 at ¶ 50.) There is no evidence the females were systematically promoted over males. Whitmore, therefore, must proceed under the indirect method of proof. During his deposition, Whitmore stated that "we should have got evaluated for the job" (Whitmore Dep., Docket # 31-1 at 118:18-19) and that "[a]t some point we should have all got tested and see" (*id.* at 118:21-22). He reiterates this later, explaining that he should have been given "some chance." (*Id.* at 123:1.) He is not saying he "should have" been offered the position. (*See id.* at 118:17-18.) Whitmore's complaint, therefore, is about the procedure that Boelter used. He does not accuse Boelter of having an illegitimate motive for not soliciting applications or for the promotions it did offer, let alone offer any sort of

20

evidence that Boelter did not consider him or approach him because he is male. Therefore, he has failed to establish a *prima facie* case of failure to promote.

The absence of any evidence of pretext is an alternative basis for granting summary judgment on Whitmore's failure to promote claim. Even assuming he could establish a *prima facie* showing of sex discrimination, Whitmore has offered no evidence showing that Boelter's reason for selecting Roohr and Cox to fill the newly-created position—that they demonstrated on-the-job leadership skills, process and expectation compliance, and computer skills following the implementation of the new ATO system (DPFOF, Docket # 30 at ¶ 48)—was pretextual. Indeed, as noted above, there is no evidence of any systematic promotion of females over males at Boelter.

### 1.3    Wrongful Termination

During his deposition, Whitmore testified that he believes he was wrongfully terminated, largely because he was told he was not being terminated because of his performance and because Boelter filled his position with a female, particularly Barbara Roohr. (Whitmore Dep., Docket # 31-1 at 120:5-11.) To establish a *prima facie* case of sex discrimination under Title VII, Whitmore must show that (1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer treated a similarly situated woman more favorably. *See Cullen v. Indiana University Bd. of Trustees*, 338 F.3d 693, 704 (7th Cir. 2003). Certainly, being terminated is an adverse employment action. *See, e.g.*, *Egan v. Freedom Bank*, 659 F.3d 639 (7th Cir. 2011) (internal citation omitted). Whitmore has not presented direct evidence that he was terminated because he was male. Further, Whitmore cannot establish a *prima facie* case because he cannot show that a similarly situated woman was treated more favora-

bly. Of the eight casual employees in the repack area who were terminated during the reduction of force, five were men and three were women. (DPFOF, Docket # 30 at ¶ 122.) On the day Whitmore was fired, four casual employees in the repack area were fired: two women and two men (including the plaintiff). (*Id.* at ¶ 123.) Whitmore seems to want to compare himself to Roohr. But Roohr was not similarly situated. Whitmore was a casual employee; Roohr was a regular employee. (*Id.* at ¶ 143.) This meant she is further down the line in termination order when a reduction in force is needed. (*Id.* at ¶¶ 7, 8, 14, and 15.) She was therefore not in the same position as Whitmore.

As with Whitmore's failure to promote claim, the absence of a showing of any pretext is an alternative basis upon which I can grant summary judgment. Even assuming that Whitmore could establish a *prima facie* case of sex discrimination, he has offered no evidence that the reasons Boelter has offered to explain his termination are pretext. According to Boelter, he "was terminated because Boelter Brands was overstaffed, he was a Casual Employee, he had an entry-level assignment as a Line Worker, and he did not distinguish himself under the new ATO system." (*Id.* at ¶ 126.) Boelter has shown that it has a standard practice for reducing its force when the number of its employees exceeds the demands of its business. (*See id.* at ¶¶ 7, 8, 14, and 15.) It followed the process in the fall and winter of 2011 after the new ATO system was implemented and its busiest quarters came to a close. (*Id.* at ¶ 116.) Whitmore has provided no evidence that Boelter's proffered legitimate reasons for terminating him are pretext.

### 1.4    Retaliation

Next, construing Whitmore's complaint liberally, as I must, Whitmore alleges that he was retaliated against for saying he was going to file a report with the ERD or EEOC.

During his deposition, Whitmore testified that he believes that the manager started treating him differently after he mentioned the ERD or EEOC; particularly, he believes the manager tried to pester him, to push him to leave or to quit, and tried to make his workload heavier. (Whitmore Dep., Docket # 31-1 at 100:15-101:3.) He also links his retaliation to asking to move from being a Line Leader to a regular Line Worker. (*Id.* at 119:10-16.) To establish a *prima facie* case of retaliation, Whitmore must establish that "(1) he engaged in protected activity, (2) that he was subjected to an adverse employment action, and (3) that there was a causal link between the protected activity and the employment action." *Koehler v. Sara Lee Corp.*, No. , 2013 WL 6773642, *4 (E.D. Wis. Dec. 23, 2013) (citing *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012)). The last of these elements, however, was recently modified for Title VII retaliation claims by the Supreme Court in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S.Ct. 2517, 2533 (2013). Plaintiffs now must "establish that his or her protected activity was the but-for cause of the alleged adverse action by the employer" rather than showing the protected activity was a "motivating factor" in the employer's decision to take the alleged adverse action. *Id.* at 1234.

Whitmore has presented no direct evidence that he was terminated because he said that he intended to go to the ERD or EEOC. The question, therefore, is whether there is indirect evidence that Whitmore's engaging in protected activity was the but-for cause of his termination. Assuming that Whitmore engaged in protected activity, Whitmore cannot establish that this was the but-for cause of his termination. Because an employer will rarely "actually admit to an improper motivation," plaintiffs are often left to "show that his protected activity was the cause of his termination by creating a 'convincing mosaic of circumstantial evidence' that would support the inference that a retaliatory animus was at work.

23

*Koehler*, 2013 WL 6773642, \*6 (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). Whitmore has offered no evidence that he was terminated because he said he planned or intended to go to the EEOC or ERD to complain about his wages, let alone a "convincing mosaic."

As with his previous two claims, Whitmore would not be able to show that Boelter's reason for terminating him was pretextual even if he could establish a *prima facie* case of retaliation. Boelter's proffered reasons for terminating Whitmore are that Boelter "was over-staffed, [Whitmore] was a Casual Employee, he had an entry-level assignment as a Line Worker, and he did not distinguish himself under the new ATO system." (*Id.* at ¶ 126.) And as I explained in granting summary judgment on Whitmore's wrongful termination claim, Boelter has an established and methodical practice for reducing its force when the number of its employees exceeds the demands of its business. (*See id.* at ¶¶ 7, 8, 14, and 15.) According to Boelter, Whitmore's termination was part of a seasonal reduction in force following the implementation of the new ATO system and the end of its busiest time of year. (*Id.* at ¶ 116.) Whitmore has offered no evidence that could show that Boelter's proffered legitimate reasons for terminating Whitmore are pretext.

### 2. The Equal Pay Act

To establish a *prima facie* case of pay discrimination under the EPA, the plaintiff must show that (1) employees of the opposite sex are paid different wages; (2) these employees do equal work requiring equal skill, effort, and responsibility; and (3) that the employees have similar working conditions. *Howard v. Lear Corp. EEDS and Interiors*, 234 F.3d 1002, 1005 (7th Cir. 2000) (citing *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 378 (7th Cir. 1998)). If a *prima facie* case is established, the employer may justify the disparity by way of one of

24

four possible affirmative defenses: (1) the existence of a merit system; (2) the existence of a seniority system; (3) the existence of a system that measures quantity or quality of production; or (4) the existence of any differential based on any factor except sex. *Id.* (internal citations omitted).

Whitmore is not able to establish a *prima facie* case of a pay discrimination claim under the EPA. Of the 26 employees in similar working conditions (those working in the re-pack area), six were casual employees that made $8.00 an hour, and three were male and three were female. (DPFOF, Docket # 30 at ¶¶ 110-11.) The remaining 20 employees made more than $8.00 an hour—11 were male, 9 were female. (*Id.* at ¶ 113.) The two most highly paid employees made $10.00 an hour, and one was male and the other, female. (*Id.* at ¶ 115.) This does not establish that employees of the opposite sex are paid different wages.

Even if I assume that Whitmore could establish a *prima facie* case, Boelter has shown that its reasons for paying Whitmore $8.00 an hour were not based on his sex. Rather, Boelter paid Whitmore $8.00 an hour based on his prior wage rate, the timing of his direct employment by Boelter, his status as a casual employee, his assignment as a Line Worker, and his placement in the repack area. (*Id.* at ¶ 78.) Summary judgment is therefore appropriate on Whitmore's claim under the EPA.

## CONCLUSION

Whitmore has offered no evidence (not even his own affidavit or declaration) from which a reasonable jury could conclude that Boelter's employment actions were based on his sex or that he was paid less because he is a male. Therefore, Boelter's motion for summary judgment is granted.

25

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Defendant's Motion for Summary Judgment (Docket # 28) is **GRANTED**.

**IT IS ALSO ORDERED** that the defendant's motion to adjourn the trial date (Docket # 39) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 6ᵗʰ day of January, 2014.

BY THE COURT:

_s/Nancy Joseph_____
NANCY JOSEPH
United States Magistrate Judge